UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DYLAN JAMES DOWNEY,

                            Plaintiff,

        v.

SNOHOMISH COUNTY SHERIFF'S
OFFICE, *et al.*,

                            Defendants.

Case No.  C17-1024-JCC-MAT

REPORT AND RECOMMENDATION

## INTRODUCTION AND SUMMARY CONCLUSION

Plaintiff Dylan Downey is a state prisoner who is currently incarcerated at the Monroe Correctional Complex in Monroe, Washington.  Plaintiff filed this action in July 2017 while he was confined in the Snohomish County Jail ("the Jail") in Everett, Washington.  Plaintiff alleges in his amended complaint violations of Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act ("RA"), causes of action under 42 U.S.C. §§ 1983, 1985 and 1986, and claims arising under state law.  (*See* Dkt. 19.)  Plaintiff's claims relate to various housing assignments within the Jail which plaintiff asserts did not accommodate his disability, and to a "keep separate" order involving fellow inmate Joe Pike.  (*Id.*)

Plaintiff identifies the following defendants in his amended complaint:  Snohomish County

REPORT AND RECOMMENDATION - 1

Sheriff's Office; Sheriff Ty Trenary; Corrections Bureau Chief Tony Aston; Corrections Hatchell and Huntsinger; Corrections Sergeants Moody, Marler, Hall, and Roy; Corrections Captain Dan Stites; Classification Officers Lilly and Dilley; Classification Supervisor Kimberly Parker; Classification Specialist Terri Bloss; Health Services Administrator Alta Langdon, ARNP; Nurse Milea Dizon; and, Snohomish County.[1]  (Dkt. 19 at 3-5.)  Plaintiff seeks declaratory and injunctive relief, and damages.  (*Id*. at 25-26.)

Defendants now move for summary judgment.  (*See* Dkts. 112-127, 130-132.)  Plaintiff has filed papers in opposition to defendants' motion (Dkts. 139, 140, 145), and defendants have filed a reply and a supplemental reply in support of their motion (Dkts. 141, 146).  The Court, having reviewed defendants' summary judgment motion, all briefing relating to this motion, and the balance of the record, concludes that defendants' motion for summary judgment should be granted and plaintiff's amended complaint and this action should be dismissed with prejudice.

<u>FACTS</u>

Plaintiff was booked into the Snohomish County Jail on December 28, 2016, after being transferred from federal custody pursuant to a writ of habeas corpus.  (*See* Dkt. 132, Ex. A.)  At the time of his booking, plaintiff was seen by Health Services Administrator (HSA) Alta Langdon who noted that plaintiff had a left leg amputation and that he wore a prosthetic leg.  (Dkt. 131, ¶ 6.)  Ms. Langdon observed that plaintiff was able to ambulate safely with his prosthetic without assistance.  (*Id*.)  Plaintiff also had access to a wheelchair if he needed it.  (*Id*.)

Plaintiff was initially housed in the F4 module, a high/medium security module located in

---

[1]  The record makes clear that the defendant plaintiff identified as Deputy Huntsinger in his amended complaint is actually Deputy Hunstiger, and that the defendant plaintiff identified as Terry Vloss in his amended complaint is actually Terry Bloss.  Throughout the remainder of this document, the Court will refer to these individuals by their correct names rather than the names assigned by plaintiff in his pleading.

REPORT AND RECOMMENDATION - 2

1  the newer part of the Jail. (Dkt. 132, ¶ 6.) During the course of his confinement, plaintiff was also

2  housed at times in the F1 module which is also located in the newer part of the Jail. (*Id*., ¶ 7.) On

3  several occasions, plaintiff was sent to the maximum security unit, located in the older part of the

4  Jail, to serve sanctions for violations of Jail rules. (*Id*.) The Jail's maximum security unit is

5  partially comprised of the 4ND and 4SA modules, the two modules relevant to this action.[2] (*Id*.,

6  ¶ 6.) The newer part of the Jail was built in 2005, and it was designed and built in accordance with

7  the ADA standards in effect and relevant at that time. (Dkt. 132, ¶ 6.) The older part of the Jail

8  was built in 1986, prior to passage of the ADA. (*See id*., ¶ 7.)

9      Plaintiff's claims relate to five periods of time when he was either housed in the maximum

10  security unit, or was scheduled to be housed there. Plaintiff was housed in 4ND from March 7,

11  2017 to March 13, 2017, in 4SA from April 8, 2017 to April 9, 2017, in 4ND from April 11, 2017

12  to April 13, 2017, and in 4SA from May 22, 2017 to May 23, 2017. (*Id*., Ex. B.) On May 2, 2017,

13  plaintiff was scheduled to be moved to 4ND, but that transfer never took place. (*Id*., ¶ 8.)

14      On March 7, 2017, plaintiff was infracted for cheeking medication, for possessing a large

15  garbage bag likely used to make pruno, and for refusing to provide a urine sample. (*See id*., Ex.

16  C.) Plaintiff was found guilty of all violations and was sanctioned with five days of lockdown and

17  five days loss of good time earned. (*See id*.) Plaintiff was sent to 4ND to serve his sanction, and

18  he remained there until March 13, 2017. (*Id*., Ex. B at 2.) There is no indication in any of the Jail

19  records that plaintiff ever complained of his housing assignment or requested an accommodation

20  during his March stay in 4ND. (*See* Dkt. 132, ¶ 9, Ex. D at 2-3.)

21

22      [2] Defendants note that though plaintiff refers to the maximum security unit as the "SHU," "SHU" is not an
23  accurate term for the maximum security unit and is not a term used at the Snohomish County Jail. (*See* Dkt. 112 at 3
n.3.)

REPORT AND RECOMMENDATION - 3

Plaintiff, however, maintains that he did raise a concern regarding the accommodations in 4ND on or about March 11, 2017. (*See* Dkt. 19, ¶ 29.) Specifically, plaintiff claims that he asked Deputy Hatchell and Deputy Hunstiger to provide him access to an "appropriate shower." (*Id.*) According to plaintiff, the shower available to him in 4ND was not ADA compliant in that it had a step at the threshold, it had no rails nor any seat or stationary bench, and it did not operate at less than standing height. (*Id.*) Plaintiff claims the deputies advised him that he would need to use plastic chairs inside the shower to navigate and that he would be provided plastic bags to use on his foot since deputies could not locate any shower sandals. (*Id.*) Plaintiff asserts that when he continued to request an appropriate shower, Deputy Hunstiger told him he would have to "deal with it or take a birdbath." (*Id.*) Plaintiff further asserts that he attempted to use the designated shower, but slipped and fell and promptly got out. (*Id.*) Plaintiff concedes that he was not seriously injured during this incident. (*Id.*)

On April 7, 2017, plaintiff was again infracted for a major rules violation, and he was sent to 4SA the following day to serve a sanction of one day of lockdown.[3] (*See* Dkt. 132, Ex. B at 1 and Ex. D at 4; Dkt. 139-1 at 9.) Once again, there is no indication in the Jail records that plaintiff ever complained of his housing assignment or requested an accommodation during his one day stay in 4SA in early April. (*See* Dkt. 132, Ex. D at 4.) Plaintiff's first written complaint regarding the conditions he had been subjected to in the maximum security unit was submitted to Jail staff in the form of a grievance on May 2, 2017. (*See* Dkt. 132, Ex. D at 4, Ex. E.)

On April 10, 2017, plaintiff was infracted for attempting to communicate with a female

---

[3] Defendants have provided an incident report for the incident that gave rise to plaintiff's April 7, 2017 infraction. (*See* Dkt. 132, Ex. F.) However, while the incident report references plaintiff, it actually pertains to another inmate who was involved in the incident with plaintiff. (*See id.*) Plaintiff provided a copy of the relevant incident report with his response to defendants' summary judgment motion. (*See* Dkt. 139-1 at 9.)

REPORT AND RECOMMENDATION - 4

inmate, another major rules violation.  (*See* Dkt. 132, Ex. G.)  Plaintiff was again found guilty and was sanctioned with six days of lockdown and three days loss of good time earned.  (*See id.*)  Plaintiff claims that he pleaded with the hearing officer, Deputy Lilly, for an alternate sanction because of the shower issues, the lack of ADA compliant cells, and the general lack of accommodation for disabled prisoners in the maximum security unit.  (*See* Dkt. 19, ¶ 31.)  Despite his alleged pleas, plaintiff was transferred to 4ND on April 11, 2017 to serve his sanction.  (*See* Dkt. 132, Ex. D at 4.)  On April 13, 2017, plaintiff complained to Jail staff that he was unable to use the shower in 4ND because he was in a wheelchair.  (*See id.*)  Jail staff, including Classification Supervisor Parker, thereafter decided to have plaintiff moved to the F4 module to serve the remainder of his sanction time.  (*Id.*, ¶ 9 and Ex. D at 4.)

On April 30, 2017, plaintiff was infracted for yet another major rules violation, this time for unauthorized communication and for lying about the unauthorized communication.  (*See id.*, Ex. H.)  Plaintiff was found guilty of both violations and was sanctioned with two days of lockdown.  (*See id.*, Ex. D at 6, Ex. H.)  Plaintiff was scheduled to be moved to 4ND on May 2, 2017 to serve his sanction, but plaintiff complained to Deputy Gloor prior to the move that there were no handicap accommodations for him in maximum security.  (*Id.*, Ex. D at 6.)  Plaintiff submitted a grievance form to Deputy Gloor the same day complaining about the lack of accommodations for his disability in the maximum security unit and about the refusal of the disciplinary hearing officer to consider alternative placements for sanctions.  (*See id.*, Ex. D at 6, Ex. E.)  Though plaintiff was transported to the maximum security unit, shortly after the transfer Sergeant Moody directed that plaintiff be returned to the F4 module where he had been housed at the time of his infraction.  (*See* Dkt 132, Ex. B at 1, Ex. D at 6.)  The following day, plaintiff was transferred to the F1 module to serve his sanction time for the April 30th infraction.  (*See id.*)

REPORT AND RECOMMENDATION - 5

On May 20, 2017, plaintiff had another rules violation and was sanctioned with one day of lockdown. (*Id*., ¶ 11.) Following issuance of the sanction, there was confusion between the detention and classification staffs as to the appropriate housing for plaintiff given his ability to walk, his classification status, his various sanctions, and his past behavior. (*See id*., Ex. D at 10-13.) Plaintiff was initially sent to 4SA on May 22, 2017 to serve his sanction, but he remained there for less than 24 hours before being moved to the F4 module. (*See id*., ¶ 11.) That was the last time plaintiff was housed in either 4ND or 4SA while confined at the Jail. (*Id*., ¶ 12.) Plaintiff was transferred into the custody of the Washington Department of Corrections on or about March 7, 2018. (*Id*.)

In addition to plaintiff's complaints regarding his transfers to the maximum security unit and the disability accommodations, or lack thereof, in that unit, plaintiff also complains about defendants' compliance with "keep separate" instructions involving plaintiff and fellow inmate Joe Pike. Keep separate instructions are designed to maintain inmate safety by preventing two or more inmates from having direct contact with each other. (*See* Dkt. 123, ¶ 3.) Inmates subject to keep separate orders are housed in separate modules to the extent possible given detention staffing levels, inmate classification status, and facility layout. (*Id*.) If such inmates are housed in the same module, they are kept on separate tiers and are only allowed out of their cells at separate times. (*Id*.)

Plaintiff requested a keep separate with inmate Pike and one other inmate on April 12, 2017, and Classification Specialist Bloss approved the request on April 13, 2017. (*See* Dkt. 132, Ex. D at 4.) According to plaintiff, before he was moved from the F4 module to the F1 module on May 3, 2017 to serve his then most recent sanction, he advised the F4 module deputy, Deputy Farrell, of a keep separate concern involving inmate Pike who was housed in the F1 module. (Dkt.

19, ¶ 39.)  Plaintiff was nonetheless moved to F1 where he continued to voice his concerns regarding inmate Pike.[4]  (*Id.*, ¶ 41.)  In response to those concerns, Sergeant Hall placed plaintiff on "K-All" ("keep separate from all") status in F1.  (*Id.*, ¶ 42.)

Plaintiff complains that in addition to his move to the F1 module in early May, he came close to having contact with inmate Pike on two other occasions despite the keep separate order.  Plaintiff claims that on May 23, 2017, he and inmate Pike were released from the maximum security unit at the same time.  (*Id.*, ¶ 65.)  Plaintiff opines that this simultaneous release from maximum security was not accidental but was, instead, an orchestrated plan to place plaintiff in danger.  (*See id.*)  Plaintiff also claims that following a professional visit with his attorney on July 18, 2017, he was directed to head back to the waiting room and found that inmate Pike was already in the waiting room.  (*Id.*)  Plaintiff apparently suffered no harm as a result of being in the general vicinity of inmate Pike on these three occasions.  (*See* Dkt. 132, ¶ 15.)

DISCUSSION

Summary Judgment Standard

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the

---

[4]  At least one corrections deputy was of the understanding that the keep separate had been lifted so that plaintiff could be moved to the F1 module, though the record is unclear on this point.  (*See* Dkt. 123, ¶ 4; Dkt. 126, Ex. D at 6-8.)

REPORT AND RECOMMENDATION - 7

nonmoving party's case." *Id.* at 325.  The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden then shifts to the nonmoving party to establish a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court must draw all reasonable inferences in favor of the nonmoving party.  *Id.* at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 585.  "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense.  *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment.  *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Nor can the nonmoving party "defeat summary judgment with allegations

REPORT AND RECOMMENDATION - 8

1    in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v.*

2    *Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003).

3    <u>ADA Claims[5]</u>

4    Plaintiff alleges that Snohomish County has a practice of placing disabled prisoners in the

5    maximum security unit of the Snohomish County Jail, which does not have any disability

6    accommodated cells, showers, or visiting areas, and that this practice constitutes discrimination in

7    violation of the ADA.  (*See* Dkt. 19, ¶ 87.)  Plaintiff also claims that a number of individual

8    defendants retaliated against him in violation of the ADA.  (*See* Dkt. 19, ¶¶ 88, 90, 91, 92, 95-96,

9    101, 106, 109, 111, 113.)

10    *1.    Individual Capacity Defendants*

11    Defendants argue that, to the extent plaintiff seeks to assert ADA claims against individual

12    defendants in their individual capacities, those claims must be dismissed.  (*See* Dkt. 112 at 7.)

13    Defendants are correct.  Under the plain language of Title II of the ADA, a *public entity* must deny

14    a plaintiff the benefit of a service or program.  Plaintiff therefore may not maintain a cause of

15    action under the ADA against individual prison officers or officials in their individual capacities.

16    *See Silk v. City of Chicago*, 194 F.3d 788, 788 n.5 (7th Cir. 1999); *Butler v. City of Prairie Village*,

17    172 F.3d 736, 744 (10th Cir. 1999); *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996).

18    *2.    Discrimination Claim*

19    Title II of the ADA provides in pertinent part that "no qualified individual with a disability

20    shall, by reason of such disability, be excluded from participation in or be denied the benefits of

21

22    ⁵ While plaintiff identifies § 504 of the Rehabilitation Act ("RA") of 1973 as one of the bases of this Court's
jurisdiction in the first paragraph of his amended complaint, he does not appear to specifically assert any claim under
the RA in the 33 paragraphs setting forth his legal claims.  (*See* Dkt. 19, ¶¶ 1, 87-119.)  The Court therefore will not

23    address the RA in its analysis of plaintiff's claims.

REPORT AND RECOMMENDATION - 9

the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[6] 42 U.S.C. § 12132. In order to establish a violation of Title II of the ADA, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) he was excluded from participation in or otherwise discriminated against with respect to a public entity's provision of a service, program, or activity; and, (3) such exclusion or discrimination was by reason of his disability. *See*, *e.g.*, *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002); *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001).

To recover monetary damages under Title II of the ADA, a plaintiff must prove intentional discrimination on the part of the defendant under a deliberate indifference standard. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id*. at 1139. An entity's failure to act "must be a result of conduct that is more than negligent, and involves an element of deliberateness." *Id*.

Defendants argue in their motion for summary judgment that there is no evidence of deliberate indifference in this case. (*See* Dkt. 112 at 11.) Defendants maintain that plaintiff had use of his prosthetic leg at all times when he was housed in the maximum security unit and that he was able to effectively ambulate, thus giving staff no indication that he had any limitations. (*See* Dkt. 112 at 12.) Defendants also maintain that once plaintiff complained to jail staff about his need for accommodations, they acted immediately to redress his concerns. (*Id*.) Plaintiff counters that defendants should have been aware of his limitations, without the need for further notification,

---

[6] For purposes of the ADA, an individual with a disability is one who: (1) has a physical or mental impairment which substantially limits one or more of his/her major life activities; (2) has a record of such an impairment; and, (3) is regarded as having such an impairment. *See* 42 U.S.C. § 12102(2). Defendants do not dispute, for purposes of this motion, that plaintiff is an individual with a disability for purposes of the ADA.

REPORT AND RECOMMENDATION - 10

because of his obvious disabilities and because his prisoner movement card ("move card") stated that he needed an ADA cell and had been authorized a wheelchair. (*See* Dkt. 139 at 2; Dkt. 139-5, ¶ 7; Dkt. 145 at 2.) Plaintiff also appears to dispute defendants' assertion that they acted immediately to redress his concerns once he complained to staff about the lack of necessary accommodations in the maximum security unit. (*See* Dkt. 139 at 11.)

As detailed above, plaintiff was temporarily housed in the maximum security unit on four occasions during the course of his confinement at the Jail. On each occasion, plaintiff was sent to the maximum security unit as a sanction for violating Jail rules. Plaintiff's longest period of confinement in the maximum security unit was six days, from March 7, 2017 to March 13, 2017. (*See* Dkt. 132, Ex. D at 2-3.) Plaintiff's subsequent stays were significantly shorter, including a stay of approximately a day and a half from April 11, 2017 to April 13, 2017, and two stays of approximately 24 hours (April 8-9, 2017 and May 22-23, 2017.) (*See* Dkt. 132, Ex. D at 4, 12.)

In addition to these four occasions when plaintiff spent actual time in confinement in the maximum security unit, plaintiff was also scheduled to be moved to the maximum security unit on May 2, 2017 as a sanction for yet another rules violation, but that move did not occur. The May 2nd move was aborted after plaintiff complained to a corrections deputy about the lack of handicap accommodations in the maximum security unit, and filed a grievance complaining not only about the anticipated move on May 2nd, but about his three prior periods of confinement in the maximum security unit as well. (*See* Dkt. 132, Ex. D at 6, Ex. E.) Notably, this was plaintiff's only recorded complaint concerning either his first or second stay in maximum security, and came well after the time when any corrective action might have been taken by defendants with respect to those stays.[7]

---

[7]  Plaintiff asserts that on March 11, 2017, during his first stay in maximum security, he asked defendants Hatchell and Hunstiger to provide him access to an "appropriate shower" because the shower in 4ND was not ADA

REPORT AND RECOMMENDATION - 11

1    Plaintiff's third stay in maximum security, April 11-13, 2017, was shortened from what

2    was originally to be a six day stay in maximum security to less than two full days after it came to

3    the attention of staff that plaintiff was unable to use the shower in that unit.  (*See* Dkt. 132, Ex. D

4    at 4, Ex. G.)  Plaintiff was transferred to the F4 module to serve the remainder of his sanction.

5    (*See id*., Ex. D at 4.)

6    Plaintiff's fourth stay in maximum security, May 22-23, 2017, was also apparently cut

7    short.  (*See* Dkt. 132, ¶ 11.)  Plaintiff was sent to the maximum security unit, 4SA, on May 22nd

8    to serve a sanction which was imposed on May 20, 2017.  (*Id*.)  Plaintiff grieved his transfer, citing

9    the lack of ADA accommodations in the maximum security housing unit.  (Dkt. 139-1 at 13-14.)

10   The record shows there was a degree of confusion among the detention and classification staffs at

11   that time regarding the appropriate housing for plaintiff given his sanctions, his classification level,

12   his past behavior, and his demonstrated ability to ambulate.  (*See id*. and Ex. D at 10-13.)  While

13   there was some sense that plaintiff could be accommodated in 4SA given his ability to stand up

14   and walk, and given that the 4SA shower did not have a lip on it which would have posed an

15   obstacle for a person with a prosthetic leg attempting to ambulate into the shower or a wheelchair

16   attempting to roll into the shower, defendant Stites directed that plaintiff be moved out of 4SA less

17   than 24 hours after being moved in.  (*See* Dkt. 132, Ex. B at 1; Ex. D at 10-13.

18   The evidence in the record confirms defendants' assertion that when plaintiff made

19   documented complaints about the conditions in the maximum security unit and/or requested

20

21   compliant, but he was ultimately told he would just have to "deal with it."  (Dkt. 19, ¶ 29.)  Plaintiff claims that he
     attempted to take a shower in the non-conforming shower, but slipped and fell.  (*Id*.)  However, there is no actual
     evidence in the record that the events plaintiff describes ever occurred.  Defendants have produced evidence that

22   neither defendant Hatchell, nor defendant Hunstiger was on duty in the maximum security unit on March 11, 2017, or
     had any contact with plaintiff on that day, evidence which plaintiff has not rebutted.  (*See* Dkts. 119, 120.)  Defendants
     have also produced evidence showing that plaintiff never reported to medical staff that he was injured in the alleged

23   slip and fall.  (*See* Dkt. 130, ¶ 6.)

REPORT AND RECOMMENDATION - 12

specific accommodations, defendants acted quickly to address his concerns.  There is certainly some merit to plaintiff's contention that Jail staff should have been aware that plaintiff had at least some limitations given his obvious disability; *i.e.*, the prosthetic leg, and the fact that he had been authorized to use a wheelchair.  However, recognizing that plaintiff had limitations, and understanding what accommodations were required to address those limitations, are two different things.[8]

The record demonstrates that though plaintiff utilized both a prosthetic leg and a wheelchair while at the Jail, he was able to ambulate without assistance on his prosthetic leg.[9]  (*See* Dkt. 125, Ex. A; Dkt. 130, Ex. A; Dkt. 132, Ex. D at 10, 15.)  And, while plaintiff claims that he advised staff when he was booked into the jail that he required a wheelchair specifically for showering (*see* Dkt. 139 at 2), there is no evidence that the staff members involved in plaintiff's transfers to the maximum security unit understood that limitation.  There is also some indication in the record that there were varying views among staff members as to whether the maximum security unit could properly accommodate plaintiff, even given the full scope of his limitations, as evidenced by the discussions which took place surrounding plaintiff's transfer to maximum security on May 22, 2017.  (*See* Dkt. 132, Ex. D at 10-13.)

While there may have been some lack of clarity as to the appropriate housing for plaintiff,

---

[8]  Plaintiff makes much of the fact that his "move card" contained a notation indicating a need for an "ADA Cell."  (*See* Dkt. 139 at 33.)  However, the "move card" also contained a host of other notations and there is no indication on the card, or anywhere else in the record, as to when the notation for the "ADA Cell" might have been placed on the card.  (*See id.*)  Moreover, as defendants correctly point out, the relevant legal question is not whether any given cell was or was not an "ADA Cell," the question is whether plaintiff was denied a service or discriminated against based on his disability.  (*See* Dkt. 146 at 2-3.)

[9]  At one point, albeit after the time periods during which he was housed in the maximum security unit, plaintiff even demonstrated an ability to climb up and stand on top of a toilet while wearing his prosthetic in order to talk to another inmate through a vent.  (*See* Dkt. 132, Ex. I.)

REPORT AND RECOMMENDATION - 13

particularly in light of his behavior and various security concerns, there is simply no evidence of deliberate indifference related to plaintiff's temporary transfers to the maximum security unit. Plaintiff was sent to maximum security to serve disciplinary sanctions and the record demonstrates that on the occasions plaintiff raised specific concerns regarding his placement in the maximum security unit related to his disability, he was accommodated.[10]   Moreover, after meeting with defendant Stites on May 23, 2017, plaintiff was advised that any further rules violations would result in him being placed in "max status" in his unit and, in fact, plaintiff was not housed again in either 4ND or 4SA for the remainder of his booking.  These actions of Jail officials undermine any claim of discriminatory intent.

Plaintiff also complains that the video visitation rooms in the maximum security unit were upstairs and were therefore accessible only to non-disabled prisoners.  (*See* Dkt. 19, ¶¶ 28, 31, 73, 87.)  Regardless of where the visitation rooms were located, plaintiff makes no showing that he ever requested use of a visitation room while in the maximum security unit and was denied such service.  Plaintiff fails to establish any violation of the ADA related to the video visitation area in the maximum security unit.

### 3.    *Retaliation Claims*

Plaintiff also asserts that he was retaliated against by defendants Parker, Bloss, Stites, Langdon, Dilley and Lilly in violation of his rights under the ADA, 42 U.S.C. § 12203.  (*See* Dkt. 19, ¶¶ 88, 90, 91, 92, 95-96, 101, 106, 109, 111, 113.)  Section 12203 prohibits retaliation or

---

[10]  Plaintiff asserts that he made numerous verbal complaints to staff which were not recorded and did not result in any accommodations.  (*See* Dkt. 139 at 11.)  However, plaintiff offers no evidence to support these assertions.

REPORT AND RECOMMENDATION - 14

coercion against any individual who exercises his or her rights under the ADA.[11]  The Ninth Circuit has made clear that neither compensatory nor punitive damages are available for ADA retaliation claims, and that such claims are redressable only by equitable relief.  *See Alvarado v. Cajun Operating Co*., 588 F.3d 1261, 1270 (9th Cir. 2009).

Plaintiff seeks both monetary damages and injunctive relief in his amended complaint. Plaintiff's claim for monetary damages with respect to any ADA retaliation claim obviously fails under *Alvarado*.  And, because plaintiff was transferred earlier this year from Snohomish County custody into Washington Department of Corrections custody, any claim for injunctive relief relating to conditions at the Snohomish County Jail are moot.  *See Nelson v. Heiss*, 271 F.3d 891, 897 (9th Cir. 2001); *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991).  Plaintiff's ADA retaliation claims therefore fail.

<u>Constitutional Claims</u>

In addition to the ADA claims asserted by plaintiff in his amended complaint, plaintiff also asserts a variety of constitutional claims related to the conditions of his confinement at the Snohomish County Jail.  (*See* Dkt. 19, ¶¶ 87-116.)  Specifically, plaintiff alleges violations of his rights to equal protection and to due process under the Fourteenth Amendment, violations of his right to be free from cruel and unusual punishment under the Eighth Amendment, and violations of his First Amendment right to be free from retaliation.  (*See id*.)  Plaintiff's constitutional claims

---

[11]  Section 12203(a) provides that "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

Section 12203(b) provides that "It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

REPORT AND RECOMMENDATION - 15

appear to relate to issues concerning classification and housing, the grievance process, safety and security, medical care, and defendants' alleged retaliatory conduct, including denial of plaintiff's right to access the courts.  (*See* Dkt. 19, ¶¶ 87-116.)

A substantial number of plaintiff's constitutional claims appear to be based on alleged violations of the ADA.  The Ninth Circuit has expressly held that "a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in [his] individual capacity to vindicate rights created by Title II of the ADA . . . ."  *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002).  Thus, to the extent plaintiff intends to allege § 1983 claims against individual defendants based on violations of the ADA, plaintiff's claims fail and must be dismissed.  To the extent plaintiff's constitutional claims can be construed as claims independent of his ADA claims, his claims also fail because plaintiff has not established any violation of a federal constitutional right.

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law.  *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

### 1.    Classification and Housing

To the extent plaintiff seeks to challenge defendants' decisions regarding classification and housing, his claims do not implicate federal constitutional concerns.  The Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property without due process of

REPORT AND RECOMMENDATION - 16

1   law.  The procedural guarantees of the Fourteenth Amendment's Due Process Clause apply only

2   when a constitutionally protected liberty interest is at stake.  *Ingraham v. Wright*, 430 U.S. 651,

3   672 (1977).  It is well established that a prisoner does not have a liberty interest in a particular

4   classification status.  *Hernandez v. Johnston*, 833 F.2d 1316, 1318 (9th Cir. 1987) (citing *Moody*

5   *v. Daggett*, 429 U.S. 78 (1976)).  Likewise, a prisoner does not have a protected liberty interest in

6   the location of his confinement.  *Meachum v. Fano*, 427 U.S. 215, 223-27 (1976).  Thus, to the

7   extent plaintiff seeks to challenge decisions regarding where in the Jail he was housed, how he was

8   classified, and the constraints associated with such decisions, he has not stated any claim upon

9   which relief may be granted under § 1983.

10        2.   ***Grievance Process***

11        To the extent plaintiff alleges deficiencies in the grievance process, he also fails to state a

12   viable claim for relief.  The Ninth Circuit has made clear that a prisoner plaintiff does not have a

13   constitutional right to a grievance process, and therefore any claim alleging deficiencies in the

14   grievance process fails to state a claim for relief under § 1983.  *See Ramirez v. Galaza*, 334 F.3d

15   850, 860 (9th Cir. 2003) (finding a prisoner did not have a claim for a loss of liberty regarding the

16   processing of his grievances because inmates lack a separate constitutional entitlement to a specific

17   grievance procedure); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988) (a prisoner does not have

18   a claim for entitlement to a grievance procedure).  Thus, any intended challenge to the grievance

19   process fails.

20        To the extent plaintiff claims that defendants Parker and Bloss violated his First

21   Amendment right to seek redress of grievances when they allegedly instructed Corrections Deputy

22   Rizk to not provide plaintiff with grievances (*see* Dkt. 19, ¶¶ 59, 92), plaintiff also fails to state a

23   viable claim for relief because "a prisoner's constitutional right to petition the government for

REPORT AND RECOMMENDATION - 17

1    redress of grievances is the right of access to the courts 'which is not compromised by the prison's

2    refusal to entertain his grievance.'"    *See Hoover v. Watson*, 886 F.Supp. 410, 419 (D. Del.

3    1995)(quoting *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)).    Plaintiff has been able to seek

4    redress for his grievances through this action.

5        The Court notes as well that despite plaintiff's claim that he asked Deputy Rizk for

6    grievance forms on May 22, 2017 after he was transferred to 4SA, and that Deputy Rizk was

7    advised by classification staff not to provide plaintiff any grievance forms, plaintiff's own

8    evidence shows that plaintiff submitted two grievances regarding his housing on the date in

9    question, one of which was submitted directly to Deputy Rizk. (*See* Dkt. 19 at ¶¶ 57, 58, 59 and

10    at pp. 28, 29.)    Plaintiff's claim that he was denied grievances fails for these reasons.

11        **3.    Failure to Protect/Inadequate Medical Care**

12        Plaintiff asserts that defendants subjected him to an unnecessary risk of physical harm by

13    placing him in unsafe living conditions and/or failing to act to remove him from such conditions,

14    and by exposing him repeatedly to another inmate with whom he had a "keep separate" order in

15    place. (*See* Dkt. 19, ¶¶ 87-90, 93-100, 102-107, 111.)    Plaintiff alleges that these actions violated

16    his rights under the Eighth and Fourteenth Amendments.    Because the conduct of which plaintiff

17    complains appears to have occurred while he was a pretrial detainee at the Jail, his rights derive

18    from the Due Process Clause of the Fourteenth Amendment and not from the Eighth Amendment's

19    prohibition against cruel and unusual punishment.    *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

20        Claims alleging a due process violation for failure to protect or for failure to provide

21    adequate medical care are evaluated under an objective deliberate indifference standard.    *See*

22    *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); *Gordon v. County of Orange*, 888

23    F.3d 1118 (9th Cir. 2018).    The elements of such a claim are: "(i) the defendant made an intentional

REPORT AND RECOMMENDATION - 18

decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125 (citing *Castro*, 833 F.3d at 1071).

### a.    Conditions of Confinement

To the extent plaintiff alleges that defendants failed to protect him from a substantial risk of serious harm, or failed to ensure that he received constitutionally adequate care, when they placed him in unsafe conditions in the maximum security housing unit, or failed to prevent his placement therein, plaintiff's claims fail. Plaintiff's allegations that the conditions under which he was confined placed him at substantial risk of suffering serious harm are largely conclusory and, more significantly, plaintiff fails to demonstrate that any of the named defendants, through their actions or inaction, caused him any injury.

Plaintiff does claim that on March 11, 2017, he slipped and fell in a shower in the maximum security unit after defendants Hatchell and Hunstiger denied his request that he be provided an "appropriate shower." (Dkt. 19, ¶ 29.) However, the evidence in the record establishes that neither defendant Hatchell nor defendant Hunstiger were on duty in the maximum security unit on March 11, 2017, the day plaintiff alleges this incident occurred. The record is also devoid of any evidence that plaintiff was actually injured in this alleged incident. Plaintiff acknowledges in his complaint that he suffered no serious injury, and there is no indication in the record that plaintiff ever reported the incident, or any resulting injury, to either the corrections staff or the medical staff. Simply put, plaintiff has not alleged sufficient facts to demonstrate any violation of his due process rights

REPORT AND RECOMMENDATION - 19

arising out of defendants' alleged failure to prevent him from being housed in unsafe conditions.

### b.    Keep Separate

To the extent plaintiff asserts that defendants failed to protect him from a substantial risk of harm by the way in which they managed the keep separate order that plaintiff requested be placed with respect to fellow inmate Joe Pike, plaintiff's claims also fail.  Plaintiff asserts that despite the fact that his request for a keep separate was quickly approved by defendant Bloss, he found himself at various times placed in close proximity to inmate Pike which caused him to fear for his safety.  At issue is a period of time in early May 2017 when plaintiff was placed in the same module as inmate Pike (*see* Dkt. 19, ¶¶ 39-42, 44), an instance when plaintiff found himself in a sally port opposite inmate Pike as both were being released from the maximum security unit at the same time on May 23, 2017 (*see id*., ¶ 44), and an instance when both plaintiff and inmate Pike were in the professional visitation area at the same time on July 18, 2017 (*see id*., ¶ 65).

While plaintiff claims that he was in fear of inmate Pike, he has not alleged any physical harm, injury, or assault as a result of being in inmate Pike's vicinity on the three occasions identified in the amended complaint.  And, as defendants argue, and the record confirms, plaintiff's safety was not in jeopardy.  When plaintiff was housed in the F1 module in early May 2017 at the same time inmate Pike was housed there, they were housed in different tiers and were not allowed out of their cells at the same time.  (*See* Dkt. 123, ¶ 8.)  When plaintiff expressed safety concerns regarding inmate Pike despite the fact that they were not allowed out of their cells at the same time, plaintiff was placed on "K-All" status which meant he was only allowed out of his cell when no other inmate was out.  (*See* Dkt. 123, ¶ 8.)  Plaintiff produces no evidence that he and inmate Pike were ever out of their cells at the same time, which undermines any claim that plaintiff's safety was at risk.

REPORT AND RECOMMENDATION - 20

1    As to the other two instances complained of by plaintiff, nothing in the record demonstrates

2    that plaintiff and inmate Pike had any physical contact on the date plaintiff claims they were being

3    simultaneously released from the maximum security unit.  Plaintiff acknowledges that there was

4    no physical contact, but claims this was only because he advised the transport officers of the

5    problem when he spotted inmate Pike.  (*See* Dkt. 19, ¶ 65.)  Plaintiff's assertion in this regard is

6    speculative at best and, absent any evidence of actual physical harm, which plaintiff has not

7    produced, this claim fails.  With respect to plaintiff's allegation that he and inmate Pike were in

8    the waiting room of the professional visitation area at the same time on July 18, 2017, defendants

9    note that inmate Pike was not scheduled to be in the professional visitation area on that date, and

10   that there is no evidence that plaintiff and inmate Pike were, in fact, in the same area at the same

11   time.  (Dkt. 132, ¶ 17.)  Plaintiff offers no evidence to the contrary and, thus, this portion of his

12   failure to protect claim fails as well.

13   ### 4.    Retaliation

14       Plaintiff asserts a number of retaliation claims in his amended complaint, some of which

15   are difficult to decipher and all of which are without merit.  (*See* Dkt. 19, ¶ 91, 101, 106, 109, 113.)

16   A viable claim of First Amendment retaliation in the prison context has five basic elements:

17       (1) An assertion that a state actor took some adverse action against an inmate (2)
         because of (3) that prisoner's protected conduct, and that such action (4) chilled
18       the inmate's exercise of his First Amendment rights, and (5) the action did not
         reasonably advance a legitimate correctional goal.

19

20   *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)408 F.3d at 567–68.  *See also Barnett v.*

21   *Centoni*, 31 F.3d 813, 815–16 (9th Cir.1994) (per curiam).  In order to survive summary judgment,

22   the plaintiff bears the burden of showing that there was no legitimate penological objective to

23   defendant's actions.  *See Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir. 1995).  The Court evaluates

REPORT AND RECOMMENDATION - 21

a retaliation claim in light of the deference accorded prison officials. *Id*. at 807.

Plaintiff asserts that defendant Parker placed him in the same housing module as inmate Pike in retaliation for plaintiff's grievances regarding conditions in the maximum security unit and for plaintiff seeking disability/ADA accommodations. (Dkt. 19, ¶ 91.) However, the evidence in the record demonstrates that in early May 2017, plaintiff was transferred to the F1 module where inmate Pike was housed after plaintiff objected to being sent to the maximum security unit as a sanction for one of his several major rules violations. (*See* Dkt. 132, Ex. D at 6.) Defendant Parker makes clear that there were limited options available as to where to house plaintiff and inmate Pike due to their respective classifications, and that this is what necessitated the two of them being housed temporarily in the same module. (*See* Dkt. 123, ¶ 8.) Plaintiff makes no showing that this decision of defendant Parker, given plaintiff's asserted housing needs, his classification, and his infraction history, did not advance legitimate penological goals. This portion of plaintiff's retaliation claim therefore fails.

Plaintiff also asserts that defendant Langdon retaliated against him "by not ensuring he received adequate disability accomodations [sic] and deferring such a decision to classifications authority." (Dkt. 19, ¶ 101.) However, plaintiff fails to clearly allege that defendant Langdon took any action against him because of any protected conduct. He alleges only that she was "spiteful and retaliatory," and that they had developed a "completely adverse relationship." (Dkt. 19, ¶ 74.) The fact that plaintiff apparently didn't get along with defendant Langdon is not sufficient to establish a constitutional violation. This portion of plaintiff's retaliation claim is frivolous.

Plaintiff asserts that defendant Bloss retaliated against him by attempting to release him from maximum security at the same time as inmate Pike, or by allowing such release, because of plaintiff's complaints about defendant Bloss personally and his complaints about Jail conditions

generally.  (*Id.*, ¶ 106.)  However, plaintiff speculates that defendant Bloss was behind the alleged simultaneous release of plaintiff and inmate Pike from maximum security without providing any evidence whatsoever to support that speculation.  This claim is vague and conclusory and must be dismissed.

Plaintiff asserts that defendant Parker retaliated against him because of his attempts to maintain ADA/disability accommodations, apparently by accusing plaintiff of manipulating housing and directing that plaintiff be sent to the maximum security unit.  (*See id.*, ¶ 68, 109.) However, this claim lacks sufficient specificity or coherence to warrant further discussion.

Finally, plaintiff asserts that defendants Parker and Snohomish County retaliated against him by allowing him access to the law library for only nine hours each week and thereby interfering with his right to access the courts.  (*Id.*, ¶ 113.)  Plaintiff also complains that unknown defendants have prevented him from receiving public disclosure requests and personal and legal mail, and from accessing the courts.  (*Id.*)  With respect to the issue of law library access, the evidence in the record establishes that *pro se* litigant inmates at the Jail are allowed three, three hour visits to the law library each week, or a total of nine hours, subject to scheduling limitations.  (Dkt. 123, ¶ 6.)  Inmates may also be permitted time beyond the nine hours per week on a case-by-case basis, depending on the need of the inmate.  (*Id.*)

Plaintiff does not demonstrate that he was denied any necessary access to the law library, and the fact that he was allowed the same amount of time as other *pro se* litigants hardly establishes a viable claim of retaliation.  To the extent plaintiff complains that unknown defendants prevented him from receiving public disclosure requests and personal and legal mail, and denied him access to the courts, his claim is vague and conclusory and therefore not sufficient to establish any entitlement to relief.

REPORT AND RECOMMENDATION - 23

In sum, plaintiff has not established that any named defendant engaged in any retaliatory conduct related to inmate Pike, to disability accommodations, or to law library access. Defendants are therefore entitled to summary judgment with respect to plaintiff's retaliation claims.

5.    ***Equal Protection***

Plaintiff alleges throughout his amended complaint that defendants denied him his right to equal protection. The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." In order to state an equal protection claim, a plaintiff must show that defendants acted with an intent or purpose to discriminate against the plaintiff based upon his membership in a protected class. *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (citations omitted). The Ninth Circuit has made clear that the disabled do not constitute a suspect class for equal protection purposes. *See Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001). Moreover, plaintiff's equal protection claims are largely conclusory and his amended complaint is devoid of facts from which this Court could conclude that any of the named defendants knowingly or intentionally discriminated against him based upon his disability. Plaintiff's equal protection claims therefore fail.

<u>Conspiracy and State Law Claims/Snohomish County Sheriff's Office</u>

Plaintiff asserts in his amended complaint causes of action under 42 U.S.C. §§ 1985, 1986, and claims arising under state law. However, plaintiff concedes in his response to defendants' summary judgment motion that his conspiracy claims are not viable. (Dkt. 139 at 17.) He also agrees to dismissal of his state law claims. (*See id.* at 30.) All conspiracy claims and state law claims should therefore be dismissed. Plaintiff also asserts causes of action against the Snohomish County Sheriff's Office in his amended complaint. However, plaintiff concedes in his response to

REPORT AND RECOMMENDATION - 24

defendants' motion that the Snohomish County Sheriff's Office is not a proper party and should

therefore be dismissed from this action. (*See id*. at 5.)

CONCLUSION

Based on the foregoing, this Court recommends that defendants' motion for summary

judgment be granted, and that plaintiff's amended complaint and this action be dismissed with

prejudice. A proposed order accompanies this Report and Recommendation.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and

served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report

and Recommendation is signed. Failure to file objections within the specified time may affect the

right to appeal. Objections should be noted for consideration on the District Judge's motions

calendar for the third Friday after they are filed. Responses to objections may be filed within

**fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be

ready for consideration by the District Judge on August 10, 2018.

DATED this 19th day of July, 2018.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION - 25